UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————
|                                                        | :  |
|                                                        | :  |
| CLAIRE MORIN, M.D.                                      | :  |
|                          Plaintiff,                    | :  |
|                                                        | :  |
| v.                                                     | :  | C. A. No. 0912022 |
|                                                        | :  |
| UNIVERSITY OF MASSACHUSETTS,                            | :  |
| UNIVERSITY OF MASSACHUSETTS                             | :  |
| MEDICAL SCHOOL, and BOARD OF                            | :  |
| TRUSTEES FOR UNIVERSITY OF                              | :  |
| MASSACHUSETTS,  Drs. Adler, Candib, Deignan             | :  |
| Gleich,  Golding, Gundersen, Kedian, Kim               | :  |
| Kosteki, Lasser, Mancini, Rathmell, Shah, Shields       | :  |
| Massachusetts Board of Physician Registration          | :  |
| Maryland Board of Physicians                           | :  |
|                          Defendants.                   | :  |
—————————————————————————

## I Introduction

This prima facie case of discrimination, based on race and national origin with retaliation and a hostile work environment, involves the termination of the only black, foreign born physician in the Worcester family medicine residency program, the only person born in Zambia.  It adds defendants and charges of defamation with intentional infliction of emotional distress, tortious interference with business opportunities, breach of the covenant of good faith and fair dealing, and violation of  42 U.S.C §§§ 1981, 1983, 1985(3) & the 13th Amendment.  Plaintiff reserves her rights to add or remove the Massachusetts and Maryland licensing board as defendants for injunctive relief pending document review.

## II. Parties

1.  Plaintiff, Claire Morin MD, MPH is a US citizen residing in Gaithersburg MD.

2.  Defendant, the University of Massachusetts (UMass) is a public institution of higher education comprised of campuses in Amherst, Boston, Dartmouth, Lowell, and Worcester at 55 Lake Avenue North Worcester, MA 01655. The named individuals were supervising doctors, state actors, employed by UMass.

### III. Jurisdiction

3.  This Court has jurisdiction over this action pursuant to diversity jurisdiction, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, 42 U.S.C §§ §1981, 1983, 1985(3), 28 U.S.C. § 1331, § 1343, Defamation, Infliction of emotional distress and violation of the 13th Amendment charges.  The damages are in amounts sufficient to invoke the jurisdiction of this Court.

### IV. Exhaustion of Administrative Remedies

4.  The Plaintiff was terminated on May 1, 2006, filed discrimination charges based on national origin and retaliation on October 26, 2006 at the EEOC in Boston and amended to include race and continuing violations around April 30, 2009.

5.  She received an August 28, 2009 right to sue letter for both the Charge and Amended Charge letter and filed suit on November 24, 2009. Claims of defamation, civil conspiracy with tortious interference with contract and business opportunity, and 42 U.S.C §§§ 1981, 1983, 1985(3) discovered in August 2011, fall within statute of limitations.  The Plaint has been amended in May 2010, and September 2011 to incorporate new evidence.

### V.  Facts

6.  The Plaintiff graduated from the University of Zambia in1988 with a Bachelor of Medicine and Bachelor of Surgery degree, started residency at the University Teaching Hospital, and worked at Mutti and Monica Chiumya Memorial clinics in Lusaka Zambia.

7.  Thereafter, she studied Biostatistics and Applied Epidemiology in France.  She worked for the National AIDS Reference Laboratory and the Peace Corps Health Unit in Togo before obtaining a Masters in Public Health from Johns Hopkins University.  The Plaintiff worked in public health organizations like the World Bank, and was district epidemiologist for (13) counties for over (3) years at the Macon District Health Office, interested in chronic disease.

8.  While district epidemiologist, the Plaintiff became Adjunct Assistant Professor at Fort Valley State University.  She passed the US Medical Board Exams and completed Post-Graduate Year one, (PGY1), in family medicine at the Medical Center of Central Georgia in Macon, Georgia. She planned to research Integrative Medicine (IM) remedies for chronic disease at Harvard.  US residency was a pre-requisite.

9. The Plaintiff and Dr. James transferred to the Family Health Center (FHC) as the first and only black PGY2 residents. Unaware the only black faculty member had sued for racial discrimination.  The Defendant knew the Plaintiff's goal.  After interviews and observation of clinical skills it attested her previous training was comparable to UMass and warranted PGY2 placement.  Within (3) days of arriving, the Plaintiff worked the July 4, 2003, call and thereafter busier and less supervised calls than peers.

10.  A sixth PGY2 resident was hired around November 2003, exceeding the five funded PGY2 spots at FHC.  Dr. Shields, the Plaintiff's advisor and director of obstetrics, told the Plaintiff she would not graduate, without specific examples or a corrective action

3

plan, as due.  FHC felt she could not graduate though data was limited.  Dr. Shields

agreed to provide objective data then postponed meetings indefinitely.

11.  Around November 2003, Dr. Rathmell, a FHC supervisor missed a

precipitous delivery in obstetrics and screamed at the Plaintiff, who was unaware Dr.

Rathmell lived far away and needed extra travel time.  Dr. Rathmell said the Plaintiff

would fail without specifying a corrective action plan.  Obstetricians reported the

hostility of the interaction as unprecedented to Dr. Gleich the program director.

12.  FHC said the Plaintiff would not graduate although she performed

acceptably, similar or better than peers.

In July 2004, Dr. Manno, a supervising ER director ranked the Plaintiff very good:
"Thorough, careful, detail oriented and organized, wonderful communication skill.
Knowledge base clearly improved throughout this rotation." In August Dr. Greenberg, a
supervising cardiologist ranked her very good: "a dedicated physician. I think she will
make a wonderful physician." In October 2003,

 during Family Medicine In-patient (FMIS), the Plaintiff passed USMLE 3. This exam

permits licensing for unsupervised practice and promotion to PGY3.  In November 2003,

Dr. Blount, a FMIS supervisor commended the Plaintiff's novel

approach to patient management: "I believe it was a very effective health behavior
intervention.  When we left the room, the woman wanted to give Claire a hug. I told her
how impressed I was with her work."

13.  Although only FHC where the Plaintiff worked eight hours a week felt she

was failing, on January 26, 2004, after Dr. Rathmell's misconduct was reported, the

program prescribed remediation—an individualized education plan (IEP) to:  assess

learning needs, formulate an education plan and provide extra supervision and evaluation.

Dr. Gundersen was assigned to supervise progress monthly. Neither Dr. Gundersen nor

Dr. Shields reviewed the progress or expectations of the IEP.

14.   The Plaintiff started remediation although her performance was acceptable, similar or better than peers.  Concurrently, Dr. Magee a supervising obstetrician for women's ambulatory health ranked the Plaintiff outstanding for skills that overlap with FHC: "relates well to peers and patients, excellent background education and experience in public health."

15.   When the Plaintiff started remediation, Dr. Candib, a FHC doctor who influenced program decision imputed

"The unevenness, memory problems, gaps, blanks, and occasional clear moments are very confusing…she has functioned better at other times, but appears unrealistic in the present.  The differential diagnosis includes: ADD, panic attacks, anxiety disorder, PTSD and other dissociative disorders; drug abuse must be in the differential." February 1, 2004

(Ms. Quiros, a reader of Dr. Candib's editorial *Si Doctora* in the Annals of Family Medicine warned: "Although I realize working with other cultures may be a challenge at times, I would like to emphasize that although particular behaviors may seem to be inherent to a particular ethnic or cultural group, generalizations that attempt to describe all patients within an ethnicity may lead to stereotyping… I only encourage the reader to resist the temptation to associate the behavior she [Dr. Candib] describes with a specific ethnic group or to make generalizations about an ethnic group based on one's own experiences. (www.annfammed.org/cgi/eletters/4/5/460)

16.   The allegations of mental disability and drug use followed statements that linked race to poor performance.  During obstetrics that day, Dr. Candib deemed the Plaintiff substandard and said she would not graduate, without offering a corrective plan.  The Plaintiff asked what "It's not that the program does not want people of color," meant.  Dr. Candib emailed that she personally, wanted people of color to do better than others and shine.  On February 3, 2004, (2) days later, the program wrote the Plaintiff an official letter expressing concerns about her performance.

17.   The Plaintiff shared Dr. Candib's email with Drs. Blount and Gleich.  There was no follow-up. Dr. Blount asked if the Plaintiff realized who she was dealing with as Dr. Candib trained many faculty members.  The Plaintiff was held to higher expectations

and scheduled more weekend and holiday calls than peers—calls that tend to be busier

and less supervised.

18.   Despite allegations of mental disability and drug abuse, the Plaintiff was not

evaluated per protocol.  Moreover she performed acceptably, similar or better than peers.

Concurrently, Dr. Blake a community physician

wrote to Dr. Gleich: "I'd like to mention Dr. Claire Morin for her work in regard to my
patients.  In both cases she showed a maturity of medical judgment and a willingness to
evaluate the emotional aspects of the case as well as the physical evidence.  The result
was a very creditable and well organized study that led to proper management.  She
certainly is a credit to your program."

19.   On March 29, 2004 Dr. Candib reiterated the Plaintiff cannot pass to faculty,

although the IEP had not assessed learning needs despite (2) months of remediation.  The

Plaintiff performed acceptably, similar, or better than peers.  Concurrently, critical care

unit (CCU) experts unanimously ranked the Plaintiff very good.  Drs. Davis, Sailer

and Saukkenon noted: "excellent rotation, hard worker, got along well with her
colleagues, pleasure to work with, compassionate, has the patient's wellbeing as her goal,
well-grounded in fundamentals, will do well." In April 2004, Dr. Miotto, a supervising
surgeon rated the Plaintiff's professionalism and competence outstanding: "a very mature
resident who asks appropriate questions, is interested in learning and does not shy away
from the work that needs to get done."

20. Like Dr. Candib, FHC doctors alleged mental disability. On May 21, 2004 Dr.
Gundersen reported:: "Her inability to properly care for her patients is frightening. I feel
she has shown consistent failure at proper management of patients."

The program decided not to reappoint the Plaintiff.  Although from the time she started

remediation to when the Defendant decided not to promote her to PGY3, she worked Dr.

Bates' PGY3 call, had no IEP review meetings and

passed all the rotations.  The June 14, 2004 directors meeting confirmed: "Claire has not
failed any clinical rotations but has failed in her health center performance."

The Defendant decided to fire the Plaintiff although her direct supervisor Dr. Ballard

gave a favorable report that month:

"Claire Morin is a very strong resident. On rounds she was efficient and had appropriate differentials. She worked well with her intern, giving her room, but providing excellent supervision. Claire had several very difficult patients this block. She was able to navigate their issues well. Claire was energetic and enthusiastic. She participated in conferences and lectures. She worked well with other residents and is a team player. It was a pleasure working with Claire this month."

This was the Plaintiff's eighth FMIS block without failing. Peers graduate with (7) FMIS

blocks under equal protection and due process.

   21.  The Defendant decided to rescind the Plaintiff's residency in May 2004. Yet,

scheduled (3) blocks with FHC

doctors until August 2004, claiming the Plaintiff had (8) weeks to improve. On June 11, 2004, Dr. Gundersen wrote: "I was appalled at her total lack of knowledge and ability…She CANNOT be trusted… everything we have tried to teach her is totally LOST!!! She is dangerous to our patients and we cannot continue to allow this. Her exams are off. The nurses DON'T trust her…She often does not make sense". On June 16, 2004 he added "I must state my protest to allowing Claire on…MMCH…She does not possess a level of skill or competence to be working on this rotation." On June 29, 2004: "It is my recommendation that she fail this rotation." And on July 7, 2004 "Overall, she functions at LESS than a 3rd year medical student and makes a lot of effort to cover up her knowledge deficits." In July 2004, Dr.

Gundersen warned the Plaintiff repeatedly by fabricating that her name was on a dictation

deficiency face sheet. Supervisors knew PGY1s not PGY2s dictated FMIS charts and

said nothing. The Plaintiff dictated the chart to stop

harassing emails. Dr. Kosteki who worked with Dr. Gundersen on June 29, 2004 wrote: "I would not recommend that she pass the rotation or the residency. I think there is an underlying problem in her knowledge/ learning/ style/ experience/ judgment that is likely not able to be fixed and probably presents a significant safety risk to patients."

The Plaintiff was fired on August 3, 2004 before (8) weeks lapsed.

   22. Employees were surprised. Dr. Sharma a GI specialist wrote to Dr. Lasser, the program chairman on September

16, 2004: "Her oral presentations, assessments and plans of care were excellent and she had a sound knowledge base, so I was surprised to learn that she is being dismissed from the program due to poor performance." The letter of dismissal

described performance Dr. Ballard ranked outstanding as marginal.  FMIS blamed the

Plaintiff for a death in May 2004, while she was off-duty and Drs. Williams and Dey on

call.  Surprised, Ms. Mayers, the FMIS charge nurse wrote the

Chancellor on October 5, 2004: "Claire is a highly intelligent, perceptive young woman …Claire grew in learning showing a good grasp of the material and was able to develop excellent rapport with her colleagues and other disciplines in the hospital.  She seeks truth in each and every area of her practice whether in learning discussing or relating to patients and family members.  Claire is a high energy self-starter who quickly assumes responsibility and is not afraid to face new challenges and situations; she was quick to fit in with staff and was readily accepted by them.  At our institution we are expecting big things from Claire in the way of leadership…Thank you for the opportunity to recommend such a special and impressive young lady."

23.  The Plaintiff appealed, complaining of discrimination. On October 25, 2004 after

a fellowship interview for Integrative Medicine at Harvard, the UMass Appeal

Committee reversed the dismissal and suggested re-hiring the Plaintiff as a PGY1 at

another clinic or institution.

24. Reluctant, Dr. Lasser wrote to Dr. DeMarco, the director of Graduate Medical

Education (GME) on

October 27, 2004: "You are suggesting rehiring her…with a very drastic change in her status…The ambiguity of this decision (suggestion) is very concerning, and I think we need a lawyer to interpret it.  For instance if we decide to assist her in finding another job, and fail, have we complied with your decision? If I were in her shoes, I'd get a lawyer pronto.  I think Gerry and I need one."

Dr. DeMarco insisted on November 15, 2004: "I think you do have to take her back…the level you take her back at is the real issue here and also the location.  Do you think that it's possible that she could ever succeed at the same health center or are the faculty too biased against her? You don't need to answer here but its food for thought."

Dr. Lasser replied: "Option 1 is confusing we already gave her credit for her first year…that option 1 is in fact a viable option, then let's choose option II—assisting her to find another position.  The letter does not say "guarantee her a position somewhere else;"

it says "assist" her.  If we choose this option and she does not find a position elsewhere, would that satisfy the findings of the review committee? Could she appeal it? Would we be upheld?"

25.   Opining the Plaintiff a liability, the program *atypically* hired (2) black female

doctors for the incoming PGY1 year and interviewed another one for PGY2 with no

opening.  In lieu of demotion at FHC, the Plaintiff proposed a competency based

education plan to preserve the integrity, coherence, and progression of training. However,

despite 12/13 successful PGY2 rotations, in January 2005 the Defendant coerced the

Plaintiff to repeat (1) medical school, (5) PGY1, and (9) PGY2 rotations again.  The

Plaintiff did not consent.  She worked without a viable option.

26. FHC doctors regrouped as FMIS hospitalists and coerced (6) more FMIS blocks,

despite (8) FMIS blocks already (¶20, 34).  Two were scheduled at a PGY1 level, where

the Plaintiff's name circulated spelled *Moron* on call schedules. The Plaintiff developed

unsightly acne.

27.   In February 2005 Dr. Shields wrote: "She will be on the rotation [obstetrics] functioning at the level of a medical student…Dr. Morin's role will be to follow along learning the cognitive aspects of management of labor and delivery…If there is additional feedback that the resident prefers not to give directly to Dr. Morin at the time, the resident should contact either Dr. Shields, Dr. DiLorenzo, or Dr. Gleich, as soon as possible to review this."

Dr. Parikh a junior the Plaintiff supervised was assigned as a supervisor. Reasonable

programs honor USMLE 2 results to assess the cognitive aspects of management.  The

Plaintiff scored above the US average (86 percent), performing well in obstetrics.  Peers

who scored less were not demoted.

28.   In February 2005, Dr. Candib declined the Plaintiff's invitation to discuss

issues, expressed disappointment over her reinstatement and said FHC would not change

its position.  That month, FHC dropped the Plaintiff's clinic

patient list from as many as (10) to as low as (2) each afternoon. Dr. Rathmell reviewed: "Communication is a weak point for Claire as well.  She speaks beautifully, but English is not her first language (learned it as a teen, I believe). Her verbal and written communication is often awkward to the point where comprehension is difficult. It sometimes seems that her thought process is going faster than her words and thus not every thought is coming out completely."

Dr. Kosteki wrote: "There is a communication problem in that instruction and suggestions made to her as a learner do not always appear to be understood"

for a procedure the Plaintiff observed. Dr. Shields failed the Plaintiff as a medical student and changed Dr. James's review, although Dr. James had not done the rotation for over a year. Dr. James was not foreign born and did not complain. Comparatively the Plaintiff scored higher on in-service exams   Drs. Kosteki and Shields ignored the Plaintiff on rounds. Dr. Mahoney asked how the Plaintiff could function, remarking she would leave or be unable to function.  Dr. Mahoney reported the misconduct to Drs. Earls and Gleich in February 2005.  In March 2005, Dr.  Kedian the FHC education director, suggested that the Plaintiff leave UMass and recommended (12) months of PGY1.

29.   Concurrently, the Plaintiff's performance was acceptable, similar or better than peers.  After weekly hours of

(3) at FHC versus (70) at FMIS Dr. Golding and Mahoney advised a promotion to PGY2: "Claire Morin excelled …found her to be a dedicated, knowledgeable, enthusiastic and capable physician…strong work ethic…Her admission and progress notes were outstanding: comprehensive, detailed and well organized. She was able to synthesize information well and to communicate it effectively…I have not had an intern that was so diligent or comprehensive in their work…a compassionate physician with a sound knowledge base who provides excellent care to her patients. I look forward to working with her again."

30.   Although the review matched Dr. Ballard, who left the program before Dr. Mahoney came. In April 2005, the Defendant did not promote the Plaintiff.  It opposed full licensing and inclined denial of the Plaintiff's license, pursuant to regulation 243 CMR 1.03(5).  This provision includes complaints of gross incompetence, substance

abuse, mental instability and crime. Yet the Plaintiff passed her first attempt at the

licensing exam and peers who passed after failing once or twice were licensed.

   31. ACGME policies stipulate "Situations that consistently produce
undesirable stress in residents must be evaluated and modified." The Defendant did not
"implement prompt and appropriate corrective action," although the

Plaintiff asked to leave FHC, due to hostility and unfair reviews.  She stayed at FHC with

adverse outcome, commuting daily to Milford for pediatrics then to Boston for (2)

months of obstetrics. Dr. Leonard, an obstetrician, noted multiple skills were above

expectations for PGY1 in May 2005. Dr. Boudreau, Chairman of Obstetrics at Tuft

University affirmed

"She has met all qualifications and criteria expected.  In addition she has been a truly
conscientious physician in her relationship with patients and staff."

   32.  The Plaintiff was unlicensed, on unpaid leave in July 2005.  New reviews

secured a license that required monitoring.  The Plaintiff moved to Barre Health Center

(BHC) in August 2005.  Dr. Lillard a peer had done Integrative Medicine (IM) rotations.

The Plaintiff asked for some—in vain. In September 2005, BHC hired a fifth PGY2

resident, although only four PGY2 positions were funded, and scheduled an eleventh

FMIS block in October 2005.

   33.  FMIS changed its normal pattern and failed the Plaintiff for the first time—

after (11) FMIS blocks.  The supervisors—Drs. Deignan, Gundersen, Kim, Mancini, and

Rathmell—were from FHC.  Drs. Gundersen and Rathmell shouted publically at the

Plaintiff.  FMIS gave the Plaintiff and her intern, Dr. Jaquith, (11) patients on the first

day and credited the intern for teamwork.  The Plaintiff was evaluated poorly with

stereotypes of race and national origin—disability, poor communication, and provably

false assertions.  Drs. Rathmell and Kim graded the Plaintiff's medical

knowledge 2/10. Dr. Golding first passed then changed his mind and failed the block surmising: "She should also consider undergoing formal testing to explore the 'disconnect' between what she "knows," and how she practices. This may represent a learning disability, an anxiety disorder, or both."

Dr. Potts, the assistant program director remarked: "I am disappointed you have decided that she deserves a failing grade this month when the initial feedback at the unit director's meeting was so much more positive."

     34.  Although the Plaintiff 'failed' due to perceived disability, her performance

was acceptable, similar or better

than peers.  Drs. Catalina and Walsh from the preceding blocks in September ranked the Plaintiff outstanding: "Good
Good PEDI ED rotation.  Eager to see patients.  Good medical decision making.  Worked well with colleagues." "Dr. Morin proved to be a perceptive and thorough clinician. Her knowledge of pediatric medicine was superb and she would quickly seek further information when needed.  Dr. Morin's bedside manner placed children at ease and reassured the parents that their children were well taken care of.  Dr. Morin was well liked by our nurses and by fellow physicians."

     The Plaintiff appealed October 2005 FMIS, outlining opportunities for effective

feedback, noting that reviews did not engage her and therefore unnecessarily portrayed

her negatively. The evidence was destroyed and the IEP upheld, although this was the

only way she failed.

    35.  Holding the Defendant to standards on December 27, 2005 the Plaintiff wrote: "Evaluations suggested I consider formal testing for a learning disability.  In over 37 years of formal training no other group of trainers has suggested this.  However, I have agreed to consider testing."  There was no follow up.  In January 2006 the Plaintiff did a PGY3 call for

Dr. Duro.  The Plaintiff asked for and attained objectives of the 12th FMIS block in

February 2006 under 24/7 surveillance.  Remediation was not lifted, as due.  After

commending the Plaintiff on February 28, 2006, Dr. Gleich changed his mind and

scheduled FMIS blocks (13) and (14) in April and June 2006 respectively, planning to

use an objective assessment tool for April 2006 (March 24, 2006 letter).  The Plaintiff

stated she had exceeded FMIS requirement to Drs. Gleich and Potts and asked for IM.

36.  The Plaintiff was subjected to unnecessary and unreasonable jobs with

interchangeable medical student, PGY1, PGY2 and PGY3 roles.  Around April 26, 2006

Dr. Golding and Mancini coerced the Plaintiff a PGY2, to work overnight as a PGY1.

She was not on Dr. Cao's March 26, 2006 FMIS emergency back-up list yet admitted (8)

patients and covered the service without intern support. Supervisors did not stay in house,

or divert admissions for patient safety.  Hospitalists called in admissions.

37.  The Plaintiff filled service obligations at the expense of training; completing

(5), (7) and (13) blocks of acute care, obstetrics and FMIS rotations respectively, the

most arduous blocks in residency.  She admitted patients in the ER during time restricted

for education in April 2006, when Drs. Khan and Lu reported that Dr. Kim, a FHC doctor

was paging an admission.  The Plaintiff called saying she did not receive the page only to

be text paged: *LIAR*.  Drs. Khan and Lu looked on speechless.  The incident was reported

with no follow up.  The Plaintiff completed (14) FMIS versus (1) IM rotation.

38.  Drs. Alhabaal and Khan, peers supervisors, asked the Plaintiff what she did to

be treated this way in February and April 2006 respectively.  Dr. Alhabaal advised that

being foreign trained doctors did not position them to ask about racial comments.

39.  The Plaintiff never welcomed the harassment she was subjected to.

40.  With no objective assessment tool, on April 28, 2006, Dr. Golding asked for no

comments as he charged the Plaintiff with unsafe critical care and dismissed her, without

explaining the evidence or giving her a chance to explain herself.  She felt misjudged and

emailed for evidence.  Subjective reviews (10) days later blamed the Plaintiff for other

doctors' errors. Dr. Gundersen surmised: "She cannot recognize acutely ill patients or problems. Her abilities fall well below that of our 4th year medical student sub-interns."

Dr. Golding wrote: "There is no systematic bias here. For some reason, you seem to be unable to rapidly and efficiently process complex information to make good clinical decisions when the pressure is on.  This is a core skill…in residency."

The letter of dismissal concluded: "We do not feel that you are able to improve your performance enough to successfully and safely complete residency or practice clinical medicine."

   41. Senior physicians mismanaged patients and then blamed the Plaintiff.  In April

2006 Dr. Mancini, a FHC doctor rejected her clinical reasoning with fatal outcomes.  The

Plaintiff discontinued a blood transfusion in a patient treated for Rhabdomyolysis

explaining the anemia was dilutional and warned of likely adverse outcomes. Dr.

Mancini, restarted the transfusion.  The patient died with a hematocrit of 47.9.  Another

patient had a 'cancer' the Plaintiff assessed to be an acute abdomen and suggested

surgery. Rejecting this, Dr. Mancini paged Dr. Khan (Hena) who took over management.

The patient died from an acute abdomen.  The Plaintiff was fired.  Dr. Golding called this

 the most egregious example of mismanagement: "she wanted to obtain a surgical consultation as her next step.  Although not frankly wrong, surgical consultation would take a second priority to stabilization in this situation, and that stabilization needed to occur in CCU…I can understand why Dr. Mancini called hena."

"she fails to recognize the import of certain signs and symptoms, and does not proceed aggressively enough in her evaluation and treatment."

The Plaintiff suggested the diagnosis to Dr. Deligiannedes at sign out based on history.

Specialists would confirm Plaintiff work-ups that supervisors rejected.  When the

Plaintiff did Dr. Duro's PGY3 call in January 2006, Dr. Mancini scolded and canceled

the Plaintiff's esophageal cancer work up for FC, a patient. Specialists confirmed

esophageal cancer.  In April 2006 Drs. Gleich and Ali scolded the Plaintiff for ordering a

cancer screen in a patient who developed a clot on therapeutic levels of Coumadin.  They

consulted hematologists, who ordered the same thing—a cancer screen. The program

called the Plaintiff a *good guesser.* Dr. Golding wrote: *she anticipates and responds to*

*questions well*—not that she is competent.

42.  ACGME policies stipulate: "The psychometric characteristics of summative
evaluation tools are important.  That is, both the evaluator and resident should believe
that an assessment tool used for summative evaluations provides evidence that can be
used to make valid and reliable decisions."

Yet subjective, formative reviews from family doctors failed specialty skills against the

judgment of experts who invariably passed them.  Dr. Davis an expert wrote: "I am
finishing my 19th year here at UMASS Memorial Health Care as a staff
pulmonologist/Intensivist and sleep specialist. Our group is responsible for the medical
intensive care unit and for all of the residents who rotate through the unit. Claire…got
along tremendously well with everyone in the unit, not always the case in such a pressure
packed and busy place. I thought she was smart, bright and energetic. I never had any
concerns about her ability to perform well as a resident physician…I have run into Claire
from time to time since on the routine care wards and I have always felt the same about
her in this setting."

The Plaintiff asserted: "Because I was denied due process and not shown how my critical
care management deviated from standard practice or given specific, objective
substantiating evidence, I cannot accept this decision to terminate my residency." August
22, 2006

At the May 1, 2006 dismissal meeting in the program office, with Drs. Gleich, Golding

and Potts in attendance, Dr. Golding asked what would happen if the Plaintiff won on

appeal. Dr. Gleich said she would not get licensed. Dr. Golding wrote "none of us
believes that you have the ability to do clinical medicine…I and my colleagues believe
that you are dangerous when unsupervised."

43.  Damaging statements to third parties include a May 2006 report to the

licensing board to be released in September 2011.  Upon information and belief it

incriminates the Plaintiff about events from (¶41,42) without due diligence to ascertain

the truth.  It has unjustly blocked licensing since 2006. Unaware, the Plaintiff wasted

resources applying for licenses and residencies that invariably lost interest after

contacting the Defendant.  Alleged poor communication disqualified the Plaintiff

because she is not a native English speaker.  The EEOC asserted: "while you have
knowledge of the learned materials, you had a difficult time communicating that
knowledge to nurses, doctors and patients."

Maryland closed the Plaintiff's license application in 2010. UMass reviewed "she had
multiple incidents where evaluators documented poor performance where there was poor
communication and errors in medical management."

UMass denied full and equal enjoyment of benefits, privileges, terms, and conditions of

the contractual relationship that peers enjoyed by refusing to credit any UMass training,

yet the Plaintiff worked as a Chief Medical Officer for over a year and maintained

CME's.  Depriving credit for (2.5) years at UMass wasted (8) years towards IM.  Peers

graduate with (39) rotations including (13) PGY2 blocks.  The Plaintiff completed (41)

rotations including (19) successful PGY2 blocks in violation of the 13th Amendment that

prohibits involuntary servitude.

    44. Records were altered in response to references or investigations, to justify

violations, including: August 18, 2009 assertions to the EEOC that listed (3) failed

rotations from July 2003 to February 2004: "Many of these rotations were duplicates
because Dr. Morin did not successfully complete the rotation the first time." (¶ 20, 25,
34)

The program's October 17, 2006 letter discredited obstetrics in December 2003.  Yet it's

May 26, 2004 letter states: "While you have not received an official failing grade for any
block rotation to this point, your performance on the health center has been failing."

August 2009 the EEOC wrote: "Respondent has no record of receiving any requests for
information verifying your employment, and if it did, Respondent would have only
provided information pertaining to your dates of employment and job title.  Respondent
further stated that it cannot fill out a form that requests credentials because you did not
successfully complete anything other than a PGY1 level…there is no evidence that

Respondent provided negative references or information to prevent you from being licensed as a doctor in other states." (¶ 20, 43)

"Dr. Morin was demoted to PGY1 level as part of her competency based educational plan," (¶ 25).

"Dr. Morin's allegations of mistreatment were investigated…there was no evidence of mistreatment…rather Dr. Morin's opinion that she was being judged unfairly was divergent from the opinions of her evaluators."(¶ 11, 18, 22, 27, 28, 37)

"Dr. Morin was never suspected of nor was an allegation made of illicit drug use.  There is no information of this nature contained in her file," (¶15)

"We were not aware of a psychiatric evaluation and Dr. Morin did not say she was suffering from any psychiatric disorder. We did ask Dr. Morin if she might be suffering from undue stress or a psychiatric disorder in the course of our evaluation of her performance. We advised her of the availability of free and confidential counseling services.  She declined these services and maintained that she had no problems."

The Plaintiff: "evaluations suggested I consider formal testing for a learning disability. In over 37 years of formal training no other group of trainers has suggested this. However, I have agreed to consider testing." (¶35)

Many assertions contradicted material facts.

   45.  Decision makers based critical decisions on unreliable information.  The August 18, 2009 letter to the EEOC lists Dr. Gundersen evaluating Geriatrics, a rotation he never taught.  The termination was based on evidence from (¶40, 41,). The December 16, 2003 meeting asserted that Dr. Gundersen met the Plaintiff monthly.  The requirement started after January 26, 2004 (¶13) and failure to comply reversed the dismissal. The May 18, 2004 meeting with CCU concerns from Dr. Saltin, a chief resident who never worked with the Plaintiff, belied reviews from direct supervisors like Drs.

Sailer and Saukkenon who confirmed the rotation was excellent: "Compassionate, has the patient's well-being as her goal.  Well-grounded in fundamentals.  Will do well.  Its looks like I already completed this evaluation.  I will submit it again."

46.  The actions were intentional, done with malice, fraud or oppression in reckless disregard of inalienable rights because the Plaintiff is a black foreign born doctor, and extended beyond UMass to deny rights and privileges protected by the Constitution and laws of the United States. Consequently the Plaintiff and her family lost wages, salary, benefits, employment related opportunities, and monies she would have received if UMass had not discriminated.  The family suffered parental deprivation, homelessness, humiliation, mental anguish, emotional and physical distress that injured mind and body in ways no reasonable person should endure.

47.  UMass discriminates based on race and national origin.  In June 2011, MCAD found the University liable for discrimination based on race and national origin with retaliation and ordered UMass to promote the plaintiff Dr. Sun.  She wants an order to increase the recruitment of women of color. In multiple instances UMass minimized the achievement, capability and privileges of people of color.  All black residents, Drs. James, Morin, Service and Williams, were placed on probation.  UMass recommended Dr. James for in-patient care privileges only after this complaint was filed.  Around September 2005, FMIS retrogressively failed a rotation she passed months earlier, repeated it, and demeaned her by assigning Dr. Ali, a junior she had supervised as supervisor.  A newspaper article commending Dr. Service was displayed at BHC.  He was the last doctor to finish among peers. The only black faculty member at FHC sued for racial discrimination.  An African born manager at UMass Mr. Martins, was verbally abused demoted, humiliated and terminated by Mr. Zanette, a junior he previously supervised.  In October 2009, the Appeals Court reversed summary judgment for UMass on multiple counts including racial discrimination and breach of the covenant of good

faith and fair dealing.  See Martins v. University of Massachusetts Medical School No.

08-P-1343.  From 2003 to 2006,  (6) out of (7) doctors terminated, was foreign born.  In

October 2006, a nurse practitioner complained that she had never encountered such overt

racism after an UMass employee said, "Go back to Africa you fool."

Count I -III
Title VII, 42 U.S.C. § 2000e, et seq. 42 U.S.C. §§ 1981, 1983 Discrimination based on
race & national origin

48.  Plaintiff incorporates by reference Paragraphs (1) through (47) as if set forth herein.

49.  By the aforesaid actions, the Defendants violated Title VII, 42 U.S.C. §§

1981, 1983 by treating the Plaintiff differently and selecting her for adverse treatment

including: denial of the "full and equal enjoyment of all benefits, privileges, terms, and

conditions of the contractual employment relationship that it allowed other similarly

situated employees to enjoy", due to race and national origin. The actions were not

limited to the review process, assignment of work, and according rights and privileges of

medical practice.  As a proximate result of the discriminatory actions the Plaintiff was

deprived equal protection and due process of the 14th Amendment and harmed.

The Defendant has a pattern and practice of such conduct.  As a proximate result of this

conduct, the Plaintiff suffered damage.

Count IV

Retaliation—Title VII & 42 U.S.C § § 1983, 1981

50.  Plaintiff incorporates by reference Paragraphs (1) through (49) as if set forth herein.

51.  By the aforesaid actions, the Defendants violated Title VII, 42 U.S.C § §

1983, 1981 with a pattern of willful acts done with malice, fraud, or oppression, in

reckless disregard of the Plaintiff's rights, even after she left UMass, because she

19

engaged in protected activity related to her race and national origin . As a proximate result of this conduct the Plaintiff has suffered damages.


Count V
Hostile work environment: Title VII & 42 U.S.C § § 1983, 1981

52. Plaintiff incorporates by reference Paragraphs (1) through (51) as if set forth herein.

53. By the aforesaid actions, Defendants violated Title VII by enabling a hostile environment others and the Plaintiff perceived to be hostile to an extent they would leave or be unable to function, and failing to exercise reasonable care to prevent and correct promptly the harassing behavior, although they knew about it. As a proximate result of this conduct the Plaintiff has suffered damage.

Count VI & VII
Defamation & Breach Of The Covenant Of Good Faith And Fair Dealing

54. Plaintiff incorporates by reference Paragraphs (1) through (53), as if set forth herein.

55. By the aforesaid actions false statements injured the Plaintiff's professional reputation, imputed mental disease and indictable offense and held the Plaintiff in public contempt blocking medical practice and violating the covenant of good faith and fair dealing, reflected in non-compliance to due process and equal protection. As a proximate result of this conduct the Plaintiff has suffered damage.

Count VIII

Civil Conspiracy and Tortious interference with contract and business opportunities

56. Plaintiff incorporates by reference Paragraphs (1) through (55), as if set forth herein.

57.  By the aforesaid actions the Defendant conspired to consciously interfere with contracts and prospective business negative references with negative references and a statutory report.  As a proximate result the Plaintiff has suffered damage.

Count IX

Intentional Infliction of Emotional Distress

58. Plaintiff incorporates by reference Paragraphs (1) through (57) as if set forth herein.

59. By the aforesaid actions the Defendant intentionally inflicted emotional distress on the Plaintiff and her family for (8) years by extreme or outrageous conduct that no reasonable person should have to endure.  There is a high degree of likelihood the family will continue to experience mental anguish and emotionally distress due to this conduct.

Count X

13th Amendment

60. Plaintiff incorporates by reference Paragraphs (1) through (59) as set forth herein.

61.  By the aforesaid actions, the Plaintiff was willfully coerced to labor through the most arduous rotations in residency without due credit, consent or crime in abuse of established policies and suffered damage as a proximate result.

PRAYER FOR RELIEF

Plaintiff prays the Court to declare the employment practices complained of above as unlawful and order :

(1) the Defendants to make the Plaintiff whole

(2) equitable relief as this court deems appropriate;

(4) that the Defendants pay Plaintiff compensatory damages;

(5) for injunctive relief and actual, special and compensatory damages

(6) that the Defendant pay  punitive and liquidated damages;

(7)  that the Defendants pay liquidated damages;

(8) and retain jurisdiction of this action to ensure full compliance

 (9) the Defendants to pay Plaintiff costs, expenses, and reasonable attorney

  fees pursuant to 42 U.S.C § 1988 and 42 U.S.C § 2000 e-5

(10) grant other relief to Plaintiff as the court deems just and proper;


## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Plaintiff,


_____

Claire Morin MD, MPH
Gaithersburg, MD