UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CLAIRE MORIN,                           )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No. 09-12022-JLT
                                        )
UNIV. OF MASSACHUSETTS, et al.,         )
                                        )
            Defendants.                 )
_____)


REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

July 11, 2012

SOROKIN, C.M.J.

The pro se Plaintiff, Dr. Claire Morin, has alleged in her Amended Complaint that she

was wrongfully terminated from a medical residency program by the Defendants, the University

of Massachusetts (UMass), the UMass Medical School, and the Board of Trustees for UMass.

Docket # 17. She alleges that her termination was retaliatory, was motivated by discrimination

on the basis of her race and national origin and that she suffered from a race-based hostile work

environment. Id. The Defendants have moved for summary judgment pursuant to Fed. R. Civ.

P. 56, asserting that there are no genuine disputes of material fact and that they are entitled to

judgment on Dr. Morin's claims as a matter of law. Docket # 96.

For the following reasons, I RECOMMEND that the Court ALLOW the Defendants'

motion.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

Dr. Morin is an American citizen, born in the African nation of Zambia.  Docket # 98 at

¶ 4.  In 1988, Dr. Morin earned Bachelor's degrees in Medicine and Surgery from the University

of Zambia.  Id. at ¶ 5.  In 1995, she earned a Masters degree in Public Health from Johns

Hopkins University.  Id.  On June 30, 2003, Dr. Morin completed her first year of residency in

family practice at the Medical Center of Central Georgia in Macon, Georgia.  Id. at ¶ 6.

The Defendants collectively operate a Graduate Medical Education program, including a

family medicine residency program in which they are responsible for the clinical and academic

training of the family medicine residents.  Id. at ¶ 1.[1]  The goal of the family medicine residency

program is to produce doctors that are capable of the independent practice of safe and competent

medicine.  Id. at ¶ 3 (citing Gleich Affidavit, Docket # 97-4 at ¶¶ 2-4; Candib Affidavit, 97-7 at ¶

5).

Effective July 1, 2003, the Defendants accepted Dr. Morin into their Graduate Medical

Education program as a second-year resident.  Docket # 98 at ¶ 7; Docket # 97-4 at 12.  Like all

---

[1]    At the summary judgment stage,  the Court is obliged to view the record in the light most favorable to Dr. Morin, and to draw all reasonable inferences in her favor.  See infra at 13. Dr. Morin's Response to the Defendant's Rule 56.1 Concise Statement of Material Facts (which utilizes a citation system of her own devise) often goes well beyond the material facts alleged by the Defendants, rendering her Response not in compliance with L.R. 56.1 and thus ill-suited for its intended purpose (i.e., determining whether the facts asserted by UMass in each paragraph are genuinely disputed).  As a typical example, in response to the Defendants' ¶ 3 (the seemingly non-controversial assertion that "[t]he goal of the family medicine residency program is to produce doctors that are capable of the independent practice of safe and competent medicine") Dr. Morin provides a page of argument about the sufficiency of her own performance and the alleged discriminatory practices of UMass.   In reciting the facts, the Court generally presents the facts as they are recited in the documents relied upon by UMass's decisionmakers, citing to those documents, because the Court does not detect a genuine dispute of material fact (or else is unable to discern one in Dr. Morin's prolix Response).

residents, Dr. Morin was frequently evaluated during her time in the program.  Docket # 98 at ¶

13 (citing Docket #94-4 at ¶ 5).

Dr. Morin received inconsistent reviews.  In approximately October to November, 2003,

Dr. Jeremy Golding, a Clinical Professor of Family Medicine and Community Health, expressed

concerns to Dr. Morin orally and in written evaluations of her concerning, inter alia, Dr. Morin's

difficulties "in organizing her thoughts in written and verbal presentation" and in "integrating the

various items of clinical data to produce a logical differential and diagnostic or treatment plan."

Id. at ¶ 15 (citing Docket # 97-6 at ¶ 7; Docket # 97-6 at 20).  He further noted in his written

review that, "I am very uncertain in my evaluation of Claire's knowledge base.  Some indicators

suggest that it may be deficient, but others suggest that she may just have difficulty expressing

what she knows."  Docket # 97-6 at 20.  At the same time, Dr. Lucy M. Candib, a Professor in

the Department of Family Medicine and Community Health at UMass, also evaluated Dr. Morin

and noted that she "had difficulty with differential diagnosis,[2] made incorrect diagnoses, failed to

document key physical findings in the medical record and failed to examine an organ nearest to a

patient's chief area of complaint."  Docket # 98 at ¶ 16 (citing Candib Affidavit, Docket # 97-7

at ¶¶ 1,7).   The Residency Director, Dr. Gerald Gleich, became aware of reports of concern

about Dr. Morin's performance and "had many formal and informal conversations with the other

doctors who taught in the residency program, and many of these conversations related to Claire

Morin and the problems she was having."  Docket # 98 at ¶ 17 (citing Gleich Affidavit, Docket #

---

[2] Dr. Candib affirms that, "[a] differential diagnosis is 'the determination of which of two
or more diseases with similar symptoms is the one from which the patient is suffering, by a
systematic comparison and contrasting of the clinical findings.'" Candib Affidavit, Docket # 97-
7 at ¶ 7 n. 1 (quoting Stedman's Medical Dictionary 28th Ed. 2006).

97-4 at ¶¶ 1, 5, 7).

On January 21, 2004, UMass's residency promotions committee put Dr. Morin on a formal remediation plan. Id. at ¶ 18. Dr. Morin was informed by letter dated January 26, 2004, that "[y]ou have been placed on academic remediation at this time because of performance that is lower than expected of a middle of the year second year resident." Docket # 97-4 at 14. The letter identified eight specific areas of deficiency, noted that a "plan for improvement developed by the faculty" had been provided to her, informed her that her progress would be reviewed at monthly meetings and noted that "unsuccessful remediation may lead to dismissal from the residency." Id.

After the remediation plan was initiated, supervising physicians continued to provide negative evaluations of Dr. Morin with respect to both her patient care and her response to their instruction. Docket # 98 at ¶ 21. Dr. Candib rounded with Dr. Morin on February 1, 2004 and wrote that Dr. Morin "was not functioning at the first year resident level in any consistent way (although sometimes she could do a succinct presentation, assessment and plan)." Id. at ¶ 21 (citing Candib Affidavit. Docket # 97-7 at ¶ 8, Id. at 14.) With respect to one patient, Dr. Candib wrote that, "it was clear that [Dr. Morin] could not put what she did know together with the clinical situation." Docket # 97-7 at 14. She also noted that Dr. Morin had confused two patients and noted information for one patient in the other's chart. Id. Dr. Candib added that, "[t]he unevenness, memory problems, gaps, blanks, and occasional clear moments are very confusing. The continued global assertion of competency seems to reflect that she has functioned better at other times, but appears unrealistic in the present . . . Overall, I cannot consider this is a 'pass' for being on call." Id.

4

Dr. Morin alleges that in February, 2004, Dr. Candib said to her, "it's not that the program doesn't want people of color," and that when Dr. Morin sent an email seeking clarification, Dr. Candib responded in email that, "I do not remember making that statement. I think I meant that I, personally, want people of color to do better than others and shine." [3] Docket # 97-3 at 26-7; Docket # 97-2 at 49.

In March, 2004, Dr. Candib wrote on a Resident Evaluation Form with respect to Dr. Morin's treatment of a male patient with blood pressure which Dr. Candib considered to be "severely elevated," that Dr. Morin was "[u]nable to take one strong course of treatment to address [blood pressure] . . . I just don't get it. Where's the common sense??  Again – appears functioning at student level.  Not ready."  Docket # 97-7 at 15 (emphasis in original).  Dr. Candib affirms that in treating that patient, Dr. Morin "failed to exhibit sound medical judgment, much less good common sense" and that "[a]t that juncture, I felt that she was functioning at the level of a medical student and far below an acceptable level for a [second year resident]." Docket # 97-7 at ¶ 9.

Dr. Golding observed Dr. Morin during her February-March, 2004 and May, 2004 rotations.  Docket # 98 at ¶ 21.  He noted that she had improved in some areas and was kind to her patients, but also observed that she continued to have difficulty translating her "book

_____

[3]  Although the remark was alleged to have been made in email, neither Party has produced a copy of the email.  Dr. Candib denies any memory of the email, and UMass asserts that it was unable to locate such an email.  Although Dr. Morin alleges that she showed the email to others, the record does not reflect any testimony to that effect.  Contrary to Dr. Morin's assertions (see Docket # 105 at 40), UMass has not admitted that the email existed merely by responding hypothetically to the issue presented by its contents.

knowledge" into clinical performance and that her written orders were unclear.  Golding

Affidavit, Docket # 97-6 at ¶ 7; Golding Affidavit, Ex. E., Docket # 97-6 at 26.  He added that,

"[i]t is unclear to me that she is adequately detail-oriented to begin to take care of complex

medical patients in the hospital setting.  I am also concerned about what some have described as

a 'defensiveness' in terms of receiving feedback."  Docket # 97-6 at 26.

On May 18, 2004, UMass's Promotions Committee informed Dr. Morin in person and in

writing that "that she would not be promoted to third-year status and would remain on academic

remediation" because her "performance . . . has been below the standards needed for promotion."

Docket # 98 at ¶ 22; DeMarco Affidavit, Docket # 97-2 at ¶ 6; Id. at 11-12.  Specifically, Dr.

Morin was informed that "[y]ou have been noted to have difficulty with the organization of your

patient presentations, with prioritizing patient problems and with follow through and follow up

on plans discussed with faculty."  Docket # 97-2 at 11.  UMass further informed Dr. Morin that

"[i]f your performance in the areas noted above have [sic] not improved significantly during

your remediation period you may be dismissed from the program."  Id. at 12.  Although Dr.

Morin was notified that she had the right to appeal decisions of the Promotions Committee, she

did not appeal this decision.  Id.; DeMarco Affidavit, Docket # 97-2 at ¶ 6.

On August 3, 2004, Dr. Gleich informed Dr. Morin that because of her continued

poor performance and her "lack of improvement in performance despite remediation," UMass

was dismissing her from the residency program.  Docket # 97-2 at 13-14.  Gleich noted that since

the May meeting at which she was notified that she would not be promoted,

> your performance on the Family Medicine Inpatient Service in block 12 was deemed
> marginal with comments written by Dr. Golding expressing concern about your
> inadequate attention to detail. In block l3 your performance on the Maternal Child
> Health service was unsatisfactory.   Dr. Shah's extensive comments documented

multiple areas of poor performance. Your performance in the health center has also not shown improvement as summarized by Dr. Kedian and the faculty at The Family Health Center.

Id. at 13.

Dr. Morin appealed this decision to the Chair of the Department of Family Medicine and Community Health. DeMarco Affidavit, Docket # 97-2 at ¶ 4; Id. at 15. The Chair met with Dr. Morin and Dr. Gleich on September 7, 2004, and on September 17, 2004, the Chair upheld the Promotion Committee's decision. Docket # 97-2 at 27-29. In doing so, the Chair noted inter alia that

The record is filled with documentation of poor performance from faculty who have observed her in a variety of clinical locations. The record also does contain documentation of adequate performance; sometimes she does well and sometimes she does poorly. There is no clear way to predict how she will do. The episodes of poor performance go far beyond gaps in her fund of knowledge . . . they are directly related to the care of patients in critical clinical situations. As a result, multiple faculty feel that overall she is unsafe, and that they do not trust her ability to perform within clinical situations. There is no doubt in my mind that she is not performing at the level of a resident.

Id. at 27

The Chair also noted that Dr. Morin had received a great deal of feedback regarding her performance, but had difficulty hearing the feedback, and that she focused upon contesting specifics, while missing the bigger picture. Id. at 27-28.

Dr. Morin next availed herself of her rights of further appeal to the Chancellor/Dean of the UMass School of Medicine. Id. at 30. Dr. Morin submitted a lengthy written memorandum of appeal to the Appeal Review Committee. Id. at 32-51. Dr. Morin asserted, inter alia,: that the interventions and assistance proposed as part of the remediation plan were delayed, or never implemented; that UMass failed to comply with its own policies with respect to evaluation and

feedback for residents; that she had shown significant improvement following the implementation of her remediation plan; that areas of poor performance identified contrasted with other positive evaluations of her skills; and, that there was a pattern of disparate treatment of residents experiencing difficulties.  Id.

On October 25, 2004, the Appeals Committee reversed the decision to dismiss Dr. Morin. Docket # 97-2 at 60.  The committee informed Dr. Morin that

> [w]e have decided to reverse the decision of the department because we feel that due process, as outlined in the Graduate Medical Education Personnel Policies was not followed.  While it is clear to the committee that the faculty of the department spent an extraordinary amount of time and effort providing supervision for you and that you received more supervision than any other resident at your level of training, the plans as outlined in the Individual Education Plan and letter dated January 21, 2004 from Dr. Gleich to you were not followed.

> Id.

The committee unanimously found, however, that Dr. Morin was not functioning at the level expected for a second-year resident, and she was demoted to the status of first-year resident. Id.  She was notified that, "[i]f you remain at UMass as a PGY-1, you are in no way guaranteed successful completion of the program."  Id.

Upon her return, Dr. Morin performed acceptably as a first-year resident, although with some lack of consistency noted.  Docket # 97-2 at 65, 67.  For example, on March 23, 2005, Dr. Tracey Kedian provided Dr. Morin with a written summary of their meeting of that same date concerning Dr. Morin's progress.  Docket # 97-4 at 20.  Dr. Kedian noted that "in summary, we do not feel that your performance is consistently at the level we would expect for an R1."  Id. Moreover, Dr. Kedian informed Dr. Morin that "[t]he faculty group does not feel that you are ready to proceed to R2 level . . . and most offered that they believe you will need a full level of R1

training prior to advancing." Id.

In a February, 2005 evaluation, Dr. Nancy Rathmell noted in part that, "[c]ommunication is a weak point for Claire as well. She speaks beautifully, but English is not her first language (learned it as a teen, I believe)." Docket # 97-11 at 3.

Nevertheless, in July, 2005, Dr. Morin was promoted to second-year resident (the level at which she had started in 2003). Docket # 97-4 at 22. Dr. Gleich affirms that Dr. Morin was placed in a different facility at her request, "in the hope that a new setting might prove beneficial to her, in essence giving her a new start." Gleich Affidavit, Docket # 97-4 at ¶ 17. Upon her return to second-year status, however, Dr. Morin again began to experience difficulties. Id. at ¶¶ 18-20. On November 18, 2005, Dr. Stephen Earls wrote a memorandum to his file recounting a meeting with Dr. Morin concerning an unfavorable evaluation for October. Docket # 97-4 at 23. He wrote that he had discussed with Dr. Morin that she experienced difficulties in modifying her approach to accurately "correct her course." Id. He noted that he "asked her to understand that at all times it is necessary for her supervisors to be confident that she is capable of proceeding safely with all patient care." Id. He added that he had reminded Dr. Morin of instances where she had "failed to accurately describe a physical finding even though she had examined the part in question," and noted that when told that her error was not just a typical student mistake but was actually "atypical of residents at her level," Dr. Morin expressed disbelief. Id.

On November 15, 2005, the Residency Promotions Committee met with Dr. Morin for a "feedback session." Id. at 26. In memorializing the meeting, Dr. Golding wrote that multiple areas of Dr. Morin's performance needing improvement had been identified, in particular her organizational skills, and her ability to focus upon the "big picture." Id. Dr. Morin was also urged

to accept feedback, rather than trying to argue with it.  Id.  Dr. Morin became defensive during the meeting, and Dr. Golding noted that, "we are thwarted by her seeming inability to acknowledge error."  Id. at 27.  In total, Dr. Golding considered Dr. Morin's performance over the previous month to be "unacceptable."  Id.  Because of that unacceptable rating, Dr. Morin was notified by Dr. Gleich on November 17, 2005, that a remediation plan was necessary.  Id. at 28.  Dr. Gleich again informed Dr. Morin that "repeated failures may be grounds for dismissal from the residency program" and notified her of her right to appeal.  Id.  Dr. Morin unsuccessfully appealed her placement on academic remediation.  Docket # 97-2 at 69-71.

On December 3, 2005, Dr. Deanna Deignan sent an email to Dr. Morin outlining "some things that could have gone better in October," divided into the categories of "Organization," "Improving Medical Knowledge" and "Knowing Your Patients Better."  Docket # 97-4 at 24.  In Dr. Morin's evaluation for February, 2006, Dr. Golding wrote, "I noticed clear deficits in medical knowledge . . . as well as clinical skills" but noted some improvement throughout the month.  Id. at 33.  Similarly, Dr. Ronald Adler's February, 2006 evaluation of Dr. Morin noted that

> in many areas, Claire is behind what I would expect for a second-year resident . . .  She often seems disorganized . . .  she sometimes fails to communicate effectively with patients . . . she is sometimes distracted by minutiae, which prevents her from promptly and thoroughly attending to issues of greater importance . . . some people had concerns about her orders as they would often be unclear.

> Id. at 43.

On March 21, 2006, Matthew Collins, Vice President of Medical Services at Family Health Center of Worcester emailed Dr. Gleich that on a particular day when he was on call, Dr. Morin "performed at about the skill and knowledge level of a medical student."  Id. at 35.

In April, 2006, Hena Kahn (another second-year resident) expressed various concerns

about Dr. Morin's conduct in writing to the faculty.  Id. at 29-30.   Also in April, 2006, Dr. Ambareen Ali wrote in Dr. Morin's Professor Chief Evaluation that, "I have concerns for Dr. Morin's ability to handle complicated patients when she is burdened or stressed, or when the patients are unstable."  Id. at 37.  Among three specific examples, Dr. Ali described an incident in which Dr. Morin wrote "elaborate insulin orders" for a non-diabetic patient, and no insulin orders for a diabetic patient admitted the same night.[4]  Id.  While complimentary of Dr. Morin's personality and her level of effort, Dr. Ambareen nevertheless concluded that, "[h]er performance . . . while possibly excusable for a first-year resident, is worrisome, to say the least, in a second-year resident who is expected to manage patients acutely and safely, and teach first-year residents to do the same."  Id.

On May 8, 2006, Dr. Golding concluded that with respect to Dr. Morin's treatment of a patient with abdominal pain, Dr. Morin had either not appreciated important information, or had not relayed it to the attending physician.  Id. at 34.  Dr. Golding was also critical of Dr. Morin's clinical judgment with respect to this patient, characterizing her omissions as reflecting "a *striking* lack of judgment" and stating that, "this is precisely what I mean when I say that she does not appreciate the import of important clinical signs."  Id. (emphasis in original).  On the same day, Dr. Jasen Gundersen emailed Dr. Golding "on behalf of the group of Family Medicine Hospitalist attendings" that

> our group does not feel comfortable with Claire's involvement with our [patients].  [S]he cannot recognize acutely ill patients or problems.  Her abilities fall well below that of our 4th year medical student sub-interns . . .  given her lack of growth, continued errors and concern for patient safety, we have been forced to diminish her role with our patients.

---

[4]  Dr. Morin disputes the identity of the doctor writing the incorrect orders.

Id. at 36.

On May 1, 2006, UMass terminated Dr. Morin from the residency program. Docket # 97-2 at 73. In doing so, Dr. Gleich informed Dr. Morin that,

> Despite intensive educational interventions and increased supervision we are not seeing the improvement in performance that we expect of a second year resident. Your performance overall is plagued by a lack of consistency. At times you perform as expected but there are too many instances in which your performance is below the expected level with crucial omissions, inaction, and failure to follow through on plans for ill inpatients. Overall your supervisors and colleagues do not trust that you can follow through consistently on plans discussed with you. Your supervisors do not feel that you can act appropriately as a supervising resident in emergency situations to take the initial steps required to get patients the care they need. We feel that patients will be put at risk if we give you the level of independence accorded an average second year resident and we will not allow that to happen.

Id.

Dr. Morin appealed the termination decision unsuccessfully. Id. at 74-86. She exhausted her administrative remedies by filing Charges of Discrimination with the Equal Employment Opportunity Commission on October 26, 2006, and by her receipt of a Notice of Right to Sue on or about August 28, 2009. Dr. Morin filed suit on November 24, 2009. Docket # 1. In her Amended Complaint, she brings three claims, each brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. (Title VII): Count I is for discrimination on the basis of race and national origin, pursuant; Count II is for Retaliation; and, Count III is for a hostile work environment. Docket # 17. UMass moves for summary judgment pursuant to Fed. R. Civ. P. 56, asserting that there are no genuine disputes of material fact, and that it is entitled to judgment as a matter of law. Docket # 96.

II.     DISCUSSION

Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).   "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50  (1986). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir.1993). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc., 43 F.3d at 735 (citation omitted).

<u>Discrimination - Race and National Origin</u>

Dr. Morin's claim for discrimination on the basis of race or national origin fails first because she is unable to establish a prima facie case of discrimination in that she is unable to raise a triable issue as to whether she performed her job as a resident acceptably.

Under the <u>McDonnell Douglas</u> framework applicable to claims of discrimination based on race and national origin brought pursuant to Title VII where (as here) direct evidence of racial discrimination is lacking,[5] Dr. Morin must first establish a prima facie case of discrimination; UMass must then produce a legitimate nondiscriminatory reason for its actions; and if UMass does so, then Dr. Morin is obliged to show that a reasonable jury could find that UMass's nondiscriminatory reason is in fact a pretext for discrimination. At all times, the burden of proof remains with Dr Morin. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973).

The First Circuit has held that the <u>McDonnell Douglas</u> analytical framework is not a rigid, talismanic test: "[O]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." <u>Calero-Cerezo v. United States Dept. of Justice</u>, 355 F.3d 6, 26 (1st Cir.2004).

To establish a prima facie case of race discrimination under Title VII, Dr. Morin must show that (1) she belonged to a protected class, a racial minority; (2) she was performing her job at

_____

[5] <u>See</u> <u>Quinones v. Buick</u>, 436 F.3d 284, 289 n. 1 (1st Cir.2006). Although Dr. Morin asserts that she has direct evidence of discrimination, neither category of evidence she cites (namely that UMass criticized her communication skills when English is not her native language, and that Dr. Candib's stated that, "I want people of color to do better than others and shine") is direct evidence of discrimination. Thus, I proceed to analyze the claim under the <u>McDonnell Douglas</u> framework.

a level that rules out the possibility that she was fired for job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications.  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir.2003).

UMass asserts that Dr. Morin cannot make out a prima facie case because she cannot show that she was performing her job at a level that rules out the possibility that she was fired for job performance.  Generally, the question of whether a plaintiff has performed her job acceptably presents a jury question.  See, e.g., Charles v. Stop & Shop Supermarket Co., LLC 2012 WL 2402790 (D.Mass.) (Casper, J.) (citing Boothby v. Texon, Inc., 414 Mass. 468, 480–81 (1993)).  In this case, however, UMass has amassed an overwhelming evidentiary demonstration of Dr. Morin's inadequate performance such that no reasonable jury could conclude that she was performing her duties at a level that rules out the possibility that she was fired for job performance.

The summary judgment record (as recounted in detail, supra) is replete with consistent criticisms of Dr. Morin's performance from numerous faculty supervisors, at two separate UMass institutions.  Dr. Morin's organizational skills were often found lacking, and faculty often noted that while she possessed substantial "book knowledge," she had great difficulty in translating that knowledge to successful management of patients in the clinical setting.  Additionally, numerous faculty repeatedly noted that Dr. Morin seemed unable to receive constructive criticism in a manner indicating the potential to grow as a clinician.  Rather, she repeatedly revealed tendencies to become defensive and to focus on specifics while ignoring "big picture" issues (whether arising in the context of patient care, or with respect her own clinical shortcomings).  While Dr. Morin has demonstrated that she sometimes performed adequately (a point noted by her supervisors), it is

also clear that she often did not do so. Simply put, adequately caring for patients only sometimes is not performing adequately the job of a medical doctor, even as a medical resident. The UMass medical faculty concluded reasonably that Dr. Morin's inconsistency itself endangered its patients. Dr. Morin was twice placed on academic remediation programs and warned that a failure to improve could lead to her dismissal. Although a plaintiff's burden at the prima facie stage is not an onerous one, it is nevertheless one that Dr. Morin cannot bear.[6]

Moreover, even in the event that Dr. Morin was able to make out a prima facie case of discrimination, UMass has clearly articulated a legitimate reason for her dismissal (as described, supra) and Dr. Morin is unable at the third stage of the McDonnell Douglas order of proof to raise a triable issue with respect to pretext on the part of UMass.[7]

When the hiring and firing individual are the same person (as here, where Dr. Gleich was the Director of the residency program both at the time of Dr. Morin's application and her termination), an inference arises that discrimination did not motivate the employer. Jacques v.

---

[6] Given the number of supervisors who reviewed her work and the number of occasions upon which her performance was found to be lacking, Dr. Morin cannot raise a genuine issue of material fact with respect to the adequacy of her performance on these occasions simply by reference to her own judgment that her performance sufficed – especially when, as a trainee, she is not in the position to opine regarding the proper level of performance to expect from trainees. Notably, Dr. Morin submits no expert testimony opining that she performed at the level of a first or second year medical resident or that the standard the Defendants applied in making the termination decision was improper. In addition, there is no expert testimony in the record to the effect that UMass's individual supervisors' expectations of Dr. Morin were inappropriate or unreasonable with respect to any of the criticisms described supra (e.g., that her notes were not "chaotic" but acceptable).

[7] The Court notes that a portion of Dr. Morin's opposition to the motion for summary judgment is devoted to either rehashing discovery disputes upon which the Court has already ruled, or which were not themselves the subject of motions to compel (the time for which has already passed). Dr. Morin has had more than ample opportunity to conduct discovery and to bring to the Court's attention any deficiencies she perceived in the Defendants' responses (and has done so on numerous occasions).

Clean-Up Group, Inc., 96 F.3d 506, 512 (1st Cir.1996); LeBlanc, 6 F.3d at 847. Dr. Morin is unable to overcome that inference.

Dr. Morin's showing of pretext is limited to: (1) conclusory statements of her own subjective beliefs, which do not themselves constitute evidence (e.g., "race and national origin motivated reviews," . . . "[h]ad the Plaintiff not been a black African born doctor she would not have been dismissed" . . . "[t]he Plaintiff does not believe the program's reviews led to valid, reliable decisions" . . . "[d]ata derived from formative assessments should not be used to make high stakes decisions (promotion, graduation)"; (2) unsupported assertions, e.g., that UMass "altered academic records to make her performance appear poor," (which in any event are alleged to have occurred after she was terminated); (3) or, assertions of fact of limited probative value, such as that "she worked as a Chief Medical Officer for over a year after leaving UMass" or that "all black doctors remediated in 2004."

For example, Dr. Morin directly addresses pretext when she argues that,

the program used remediation as pretext to dismiss the Plaintiff. For example after Dr. Shields demoted the Plaintiff to a medical student she alerted doctors: 'As you know Claire Morin will be on the MMCH rotation. She will be on the rotation functioning at the level of a medical student. Each resident on the service will be working with Dr. Morin as a supervising resident and will participate in the evaluation of Dr. Morin during this rotation … Dr. Morin's role will be to follow along learning the cognitive aspects of management of labor and delivery … If there is additional feedback that the resident prefers not to give directly to Dr. Morin at the time, the resident should contact either Dr. Shields, Dr. DiLorenzo, or Dr. Gleich, as soon as possible to review this.'

Docket # 105 at 20.

Dr. Morin does not explain how in her view the quotation attributed to Dr. Shields demonstrates that remediation was merely a pretext masking a discriminatory motive based upon her race or national origin, and the Court is unable to discern any indication of discriminatory

17

motive therein.

Dr. Morin's statement that all four black doctors in 2004 (herself, Dr. James, Dr. Service and Dr. Meredith Williams) remediated is of limited probative value first because she has adduced no evidence suggesting that such remediation was unwarranted, or was a pretext for discrimination, or that any of those doctors were treated differently from non-minority doctors in similar circumstances. The assertion in Dr. Morin's affidavit in response to summary judgment that four black doctors remediated is also contradicted by her previous deposition testimony, where she initially named three black doctors (herself, Dr. James and Dr. Williams) remediated, but then retracted the statement with respect to Dr. Williams. Docket # 97-3 at 27. Dr. Morin may not create a dispute of material fact merely by contradicting by affidavit her previous sworn testimony, without adequate explanation. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999). Dr. Morin's attempt to create ambiguity with respect to this previous testimony (see Docket # 110 at 2) is not persuasive, and the record is in any event devoid of any further information about Dr. Williams, making the fact that she was remediated (even if established) of little probative value. There is no other information whatsoever in the record concerning Dr. Service. Dr. James is described by Dr. Morin as having subsequently graduated from the program. Docket # 97-3 at 65.

Dr. Morin also affirms that she believes the program was hostile to her because she would not suffer racial insults. Docket # 105-6 at 3. Her contention is not supported by the record evidence because Dr. Morin has not described any racial comments made to her that could fairly be termed insults. The only comments with a racial component specifically identified by Dr. Morin are (1) Dr. Candib's alleged statement in email to her that, "I want people of color to do

better than others and shine," and (2) her colleague, Dr. Rung's, alleged statement that the University was "not used to training black residents."

While Dr. Morin seems to interpret Dr. Candib's remark as indicating that she would only consider minority residents to be successful once they had outperformed non-minorities, that interpretation is at odds with the statement itself, which on its face appears to express only a desire to see minority residents succeed. The fact that Dr. Candib is alleged to have made this remark and also was critical of Dr. Morin's performance is not in and of itself sufficient to demonstrate that repeated criticisms of Dr. Morin's performance by numerous clinicians, at more than one institution, were a pretext masking discriminatory motives (particularly where Dr. Candib is not a decisionmaker with respect to Dr. Morin's termination, but merely one of many supervisors to provide negative evaluations upon which the Promotions Committee and Dr. Gleich relied).

Dr. Morin does not specify how Dr. Rung's statement (which she asserts was factually correct, in the sense that Dr. Morin believes the program had not previously graduated residents who were African, or of African descent) is probative of pretext. Dr. Rung was not a decisionmaker. "Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases." Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 667 (2000).

Finally, the decision made by UMass to terminate Dr. Morin from her residency is not merely a garden-variety employment decision, but rather is the type of academic or professional determination (and indeed, one which implicates the public's safety) to which Courts give substantial deference, albeit in other contexts. See e.g., Halpern v. Wake Forest Univ. Health

Sciences, 669 F.3d 454, 463 (4th Cir. 2012) and cases cited therein (disability context) ("our sister circuits have overwhelmingly extended some level of deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claim"); Bd. of Curators of Mo. v. Horowitz, 435 U.S. 78, 96, n.6 (1978) (due process claim) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation"); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 215 (1985) (due process) ("[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment").

Retaliation

Title VII forbids, among other things, any "employer to discriminate against any of his employees . . . because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that statute. See 42 U.S.C. § 2000e-3(a). Such retaliation claims are evaluated under the McDonnell Douglas burden-shifting framework. See, e.g., Mariani-Colon v. Dep't. of Homeland Sec., 511 F.3d 216, 223 (1st Cir.2007).

In order to establish a prima facie case of retaliation, Dr. Morin must establish three elements: (1) that she engaged in a protected activity; (2) that she suffered a materially adverse action, causing her harm either inside or outside of the workplace; and (3) that the adverse action was causally linked to her protected activity. Id. (citing Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 & n. 4 (1st Cir.2007)). If Dr. Morin makes this showing, the burden of production shifts to UMass to articulate a legitimate, nondiscriminatory reason for its employment decision. See McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir.2006). If UMass presents such a

reason, then Dr. Morin must demonstrate that UMass's proffered reason is a pretext, masking illegal retaliation.  Id.

Dr. Morin cannot make a prima facie case of retaliation.  The protected activity in which Dr. Morin alleges she engaged is that during her October, 2004 appeal of her initial dismissal, she complained about Dr. Candib's February, 2004, email referencing Dr. Candib's desire that, "I want people of color to do better than others and shine."  Assuming that this complaint constitutes protected activity, Dr. Morin is unable to demonstrate a causal connection between that statement during her 2004 appeal and her May, 2006 termination from the residency program.  In light of the abundant evidence in the record concerning the inadequacy of Dr. Morin's performance, and in light of the lack of temporal proximity between the two events, no reasonable jury could conclude that Dr. Morin's termination was caused by Dr. Morin's complaint about Dr. Candib's email.  This is especially so where the appeal which formed the context of Dr. Morin's protected activity was itself successful (albeit with different decisionmakers) and where Dr. Morin was as a result given an additional opportunity to complete the program with remediation, which ultimately failed after a substantial passage of time and after numerous evaluators had raised serious concerns about Dr. Morin's performance.  Moreover, as was the case with the race discrimination claim, even had Dr. Morin made out a prima facie case, UMass has advanced a legitimate non-discriminatory reason for her dismissal, and Dr. Morin is unable (for the reasons described, supra) to raise a triable issue with respect to pretext.[8]

---

[8]  The Court does not consider Dr. Morin's argument that statements made to licensing boards in other states were retaliatory, since those alleged acts did not occur within the context of Dr. Morin's employment, which had terminated.  While they might conceivably be termed defamatory (if the elements of such a claim could be proven), Dr. Morin has not brought a claim for defamation.

<u>Hostile Work Environment</u>

To succeed on her race-based hostile work environment claim, Dr. Morin must establish: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her race; (4) that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of her employment; (5) that the conduct complained of was both objectively and subjectively offensive; and (6) that some basis for employer liability has been established.  <u>Prescott v. Higgins</u>, 538 F.3d 32, 42 (1st Cir.2008).  Whether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  <u>Id.</u>

Dr. Morin cannot establish the elements of a hostile work environment claim.  As noted previously, Dr. Morin points to only two comments (those by Dr. Candib and Dr. Rathmell; <u>see</u> <u>supra</u> at 4,8) which referenced her race or national origin in any fashion.  Neither comment is clearly derogatory, and in fact both could reasonably be construed as supportive.  In fact, at her deposition, Dr. Morin testified that Dr. Candib's remark stood out in her memory precisely because no other faculty supervisor had ever mentioned her race to her.  Docket # 97-3 at 27.  In these circumstances, no jury could reasonably conclude that Dr. Morin was subjected to harassment based upon her race or national origin which was severe or pervasive such as would support liability under Title VII.

## III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW the Defendant's

Motion for Summary Judgment (Docket # 96).[9]


                                         /s/ Leo T. Sorokin
                                        Leo T. Sorokin
                                        Chief United States Magistrate Judge

---

[9] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).